**WO**

NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Michael Thompson, et al., | No. CV-16-02868-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| Polaris Industries Incorporated, et al., | |
| Defendants. | |

Before the Court are Defendants' *Daubert* Motion to Exclude the Expert Testimony of Bill Uhl (Doc. 176), Plaintiffs' Response[1] (Doc. 182), and Defendants' Reply (Doc. 184); and Plaintiffs' Corrected *Daubert* Motion to Exclude the Expert Testimony of Elizabeth Raphael (Doc. 179), Defendants' Response (Doc. 180), and Plaintiffs' Reply (Doc. 183). Plaintiffs have also filed an unopposed Motion to Seal Plaintiffs' Response to Defendants' *Daubert* Motion (Doc. 181).

**I.    BACKGROUND**

On February 19, 2014, Mr. Michael Thompson ("Mr. Thompson") and his wife, Ms. Rhonda Thompson ("Ms. Thompson"), (collectively "Plaintiffs") rented a 2011 Polaris RZR, VIN 4XAVE76A3BB076570, ("the Polaris RZR") from Defendant Jet Rent ("Jet Rent") located in Yuma, Arizona. (Doc. 1-1 at 58-69[2]). The 2011 Polaris RZR was

---

[1] Plaintiffs' request for oral argument is denied because the issues are adequately briefed and oral argument would not be useful. *See* Fed. R. Civ. P. 78(b); LR Civ. 7.2(f); *Lake at Las Vegas Investors Grp., Inc. v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

[2] The citation refers to the document and page number generated by the Court's Case Management/Electronic Case Filing system.

1  designed, manufactured, and sold by Polaris Industries, Inc. ("Polaris") and Polaris Sales, Inc. ("Polaris Sales") (collectively "Polaris Defendants") for people to use as an off-road recreational vehicle. (*Id.* at 59). It was equipped with a roll cage and a lap and shoulder belt, which are known collectively as the rollover protection system ("ROPS"). (*Id.* at 60). At about 4:00 p.m. on February 19, 2014, Mr. Thompson was driving the Polaris RZR and Ms. Thompson was riding as a passenger in the desert area east of South Fortuna Road when the Polaris RZR rolled over. (*Id.*) Traveling at a speed of 30 to 35 mph, the couple drove the RZR over a berm, traveled 25-30 yards through the air, landed on the ground, and rolled over. Both Mr. and Ms. Thompson were wearing the vehicle's seatbelts and helmets provided by Jet Rent. (*Id.*) During the rollover, Mr. Thompson suffered injury to his spinal cord that resulted in quadriplegia. (*Id.* at 60-61).

Plaintiffs filed their Complaint in Arizona state court and Defendants subsequently removed it to this Court. (Doc. 1). Plaintiffs' Complaint alleged a strict liability claim, negligence claims, and a punitive claim. (Doc. 1-1 at 16-25). Pursuant to a stipulation, Defendant Jet Rent was dismissed on December 8, 2016. (Doc. 19). On October 2, 2018, pursuant to a stipulation, Plaintiffs' punitive damages claim was dismissed. (Doc. 123). Therefore, the only remaining claims are Plaintiffs' claims for strict products liability and negligence remain and the only remaining defendants are Polaris Defendants.

## II. MOTION TO SEAL

### A. Legal Standard

Two standards generally govern requests to seal documents. "First, a 'compelling reasons' standard applies to most judicial records." *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2009) (citing *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)).

> This standard derives from the common law right "to inspect and copy public records and documents, including judicial records and documents." To limit this common law right of access, a party seeking to seal judicial records must show that "compelling reasons supported by specific factual findings . . . outweigh the general history of access and the public policies favoring disclosure."

*Id.* (quoting *Kamakana*, 447 F.3d at 1178-79).

The second standard applies to discovery materials. "'Private materials unearthed during discovery' . . . are not part of the judicial record." *Id.* (quoting *Kamakana*, 447 F.3d at 1180). The "good cause" standard set forth in Federal Rule of Civil Procedure 26(c) applies to this category of documents. *Id.* For good cause to exist under Rule 26(c), "the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips v. G.M. Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (quotation and citation omitted). Instead, the party seeking protection must make a "particularized showing of good cause with respect to [each] individual document." *San Jose Mercury News, Inc. v. U.S. Dist. Court – N. Dist. (San Jose)*, 187 F.3d 1096, 1103 (9th Cir. 1999).

The good cause standard also applies to documents attached to non-dispositive motions because those documents are often "'unrelated, or only tangentially related, to the underlying cause of action.'" *Phillips*, 307 F.3d at 1213 (citation omitted). Documents attached to dispositive motions, by contrast, are governed by the compelling reasons standard. *See Pintos*, 605 F.3d at 678-79. This higher standard applies because the resolution of a dispute on the merits "is at the heart of the interest in ensuring the 'public's understanding of the judicial process and of significant public events.'" *Kamakana*, 447 F.3d at 1179 (citation omitted).

**B. Discussion**

In their Unopposed Motion to Seal Plaintiffs' Response to Defendants' *Daubert* Motion, Plaintiffs provide that their Response, as well as certain exhibits to the Response, "including the reports of Plaintiffs' experts, Bill Uhl and Alan Cantor, and certain excerpts of the deposition of Polaris' employee, Aaron Deckard, identify, reference and/or contain excerpts of certain documents produced by the Polaris defendants in this case, which the Polaris defendants designated as 'confidential' under the terms of the parties' stipulated

Protective Order." (Doc. 181 at 2). Plaintiffs do not further identify the documents or information that were designated as confidential. Instead, Plaintiffs provide that "in an effort to narrow the issues the Court is being asked to decide vis à vis the defendants' motion to exclude Mr. Uhl, and the Plaintiffs' opposition thereto, and to avoid unnecessarily burdening the Court, Plaintiffs' request—solely for purposes of responding to and opposing the defendants' motion— that Plaintiffs' Response and attached exhibits be filed with the Clerk 'under seal'. [sic]" (*Id.*)

As *Daubert* motions are non-dispositive, the good cause standard will be applied. *See Marsteller v. MD Helicopter Inc.*, 2018 WL 4679645, at *2 (D. Ariz. Sept. 28, 2018). The only proffered reason for sealing the Response and related exhibits is that they "identify, reference and/or contain excerpts of certain documents" that have been marked confidential. This falls far short of the requirement that Plaintiffs must make a "particularized showing of good cause with respect to [each] individual document." *San Jose Mercury News*, 187 F.3d at 1103. Plaintiffs' Response and attached exhibits total 193 pages; thus, the Court is unable to determine what documents or information have been designated as confidential. Thus, the Plaintiffs have not succeeded in attempting to "avoid unnecessarily burden[ing] the Court." Accordingly, the Court will deny Plaintiffs' Unopposed Motion to Seal Plaintiffs' Response to Defendants' *Daubert* Motion.

### III. *DAUBERT* MOTIONS

#### A. Legal Standard

Rule 702 of the Federal Rules of Evidence tasks the trial court with ensuring that any expert testimony provided is relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1999). Under Rule 702, a qualified expert may testify on the basis of "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence," provided the testimony rests on "sufficient facts or data" and "reliable principles and methods," and "the witness has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). An expert may be qualified to testify based on his or her "knowledge, skill, experience, training, or education." *Id.*

"Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action." Fed. R. Evid. 401. The trial court must first assess whether the testimony is valid and whether the reasoning or methodology can properly be applied to the facts in issue. *Daubert*, 509 U.S. at 592–93. Factors to consider in this assessment include: whether the methodology can be tested; whether the methodology has been subjected to peer review; whether the methodology has a known or potential rate of error; and whether the methodology has been generally accepted within the relevant professional community. *Id.* at 593–94. "The inquiry envisioned by Rule 702" is "a flexible one." *Id.* at 594. "The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.* The proponent of expert testimony has the ultimate burden of showing that the expert is qualified and the proposed testimony is admissible under Rule 702. *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

The *Daubert* analysis is applicable to testimony concerning non-scientific areas of specialized knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). However, the *Daubert* factors may not apply to testimony that depends on knowledge and experience of the expert, rather than a particular methodology. *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000) (citation omitted) (finding that *Daubert* factors do not apply to police officer's testimony based on twenty-one years of experience working undercover with gangs). An expert qualified by experience may testify in the form of opinion if his or her experiential knowledge will help the trier of fact to understand evidence or determine a fact in issue, as long as the testimony is based on sufficient data, is the product of reliable principles, and the expert has reliably applied the principles to the facts of the case. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 579.

The advisory committee notes on the 2000 amendments to Rule 702 explain that Rule 702, as amended in response to *Daubert*, "is not intended to provide an excuse for an automatic challenge to the testimony of every expert." *See Kumho Tire Co.*, 526 U.S. at 152. "Vigorous cross-examination, presentation of contrary evidence, and careful

1  instruction on the burden of proof are the traditional and appropriate means of attacking
2  shaky but admissible evidence." *Daubert*, 509 U.S. at 595 (citation omitted).

### B. Defendants' *Daubert* Motion (Doc. 176)

Here, Defendants have challenged Plaintiffs' expert Mr. Bill Uhl's qualifications in this matter. (Doc. 176 at 4). Mr. Uhl's qualifications as an expert stem solely from "real-world experience." (Doc. 182 at 8). As Defendants point out, Mr. Uhl lacks formal education or training in engineering, accident reconstruction, or human factors; his highest level of education is a high school degree and he has never designed a ROPS or restraint system. (Doc. 176 at 4-5). Mr. Uhl has worked as an off-road vehicle operator instructor and expert consultant for governmental agencies and public companies for more than thirty years. (Doc. 182 at 7). As part of that work, Mr. Uhl creates and teaches courses in the safe operation of off-road vehicles based on the agency or company's intended use of the off-road vehicle. (*Id.*) Mr. Uhl avers that he provides an independent analysis of the "vehicle design parameters related to occupant safety, including the appropriate safety equipment required for each vehicle based upon its geometric deign, operational characteristics and environment of use." (*Id.* at 8). While "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience," the advisory committee notes emphasize that "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note.

Defendants specifically challenge Mr. Uhl's qualifications to opine on the adequacy of Polaris's process of designing the ROPS and restraint harness system, the adequacy of the ROPS and restraint harness system in the Polaris RZR in a rollover accident, and the handling characteristic of the Polaris RZR.[3] (Doc. 176 at 6-7).

---

[3] Defendants also challenge Mr. Uhl's qualifications to opine on the adequacy of the Polaris RZR's warnings; however, Plaintiffs have provided that Mr. Uhl will not be providing testimony on that subject. (Doc. 182 at 7). In light of Plaintiffs' representations, the Court will not address whether Mr. Uhl is qualified to opine on the Polaris RZR's warning. Additionally, Defendants argue that Mr. Uhl's testimony is duplicative of Plaintiffs' other experts. (Doc. 176 at 10). That may be right, but the Court reserves judgment on whether

- 6 -

1. **Mr. Uhl Cannot Opine on the Adequacy of the Polaris RZR Design Process.**

Regarding the adequacy of the Polaris RZR design process, Mr. Uhl opined that Polaris let cost dictate the design of the restraint harness system and that Polaris did not conduct the necessary tests when designing the Polaris RZR's ROPS. Specifically, Mr. Uhl opined that "Polaris cheapened the restraint [harness] system when it came time to sell the unit to the public" (Doc. 182-4 at 16), and that "Polaris made concessions that prioritized profits and forfeited safety." (Doc. 182-4 at 19). Essentially, Mr. Uhl is opining on Polaris's motivation for certain design decisions; however, he cites no financial data or evidence to support his opinion that cost was a factor in the design of the Polaris RZR restraint harness system. Moreover, Mr. Uhl concedes that he did not have access to all of the financial data regarding the design of the Polaris RZR; thus, the Court finds that Mr. Uhl's opinions are nothing more than speculation. The Court will not permit Mr. Uhl to opine regarding the costs of the specific restraint harness system and how that costs affected the Polaris RZR design.

Mr. Uhl also opined on the design process of the Polaris RZR. Specifically, Mr. Uhl stated that "Polaris failed to properly test the design of the roll cage." However, Mr. Uhl has no experience designing ROPS or restraint harness systems (Doc. 109 at 202-03), nor does Mr. Uhl provide any other data or evidence. With such a paucity of knowledge regarding the specifics of designing ROPS or restraint harness systems, Mr. Uhl is unable to give reliable testimony on whether Polaris properly designed the Polaris RZR's ROPS or restraint harness system. Thus, the Court will not allow Mr. Uhl to opine on this subject.

2. **Mr. Uhl Cannot Opine on the Adequacy of the Polaris RZR's ROPS and Restraint System.**

Mr. Uhl opined that "Polaris did not put in a crashworthy restraint harness system to eliminate significant occupant excursion, nor did it include a crashworthy roll cage that provided geometrically appropriate head clearance." (Doc. 182-4 at 13). The Court does

---

an expert is duplicative until trial, when it will be in a better position to evaluate the issue of whether the testimony is duplicative.

not doubt that "[a]s a participant in off-road vehicle education and training, [Mr. Uhl has] become well-aware of the safety designs the industry has incorporated and [that] individuals have adapted to their vehicles—including different restraint [harness] systems and ROPS to enhance safety during foreseeable usages." (Doc. 182-4 at 4). However, the Court finds that whether the Polaris RZR's restraint harness system and ROPS provided adequate protection in a rollover accident is a technical opinion that Mr. Uhl does not have the necessary training or expertise to opine on. *See Luviano v. Multi Cable, Inc.*, 2017 WL 3017195, at *10 (C.D. Cal. Jan. 3, 2017) (finding that the expert lacked sufficient nexus between her educational and professional background and many of the opinions she offered). Because Mr. Uhl was knowledgeable about different types of off-road vehicles and their ROPS and restraint harness systems, the Court will permit Mr. Uhl to testify that the ROPS and restraint harness systems work in conjunction with one another. However, as noted, Mr. Uhl has no education or experience in the design of ROPS or restraint harness systems, nor does he have any formal education or training in engineering, accident reconstruction, or human factors. *See Diviero v. Uniroyal Goodrich Tire Co.,* 919 F. Supp. 1353, 1357 (D. Ariz. 1996), *aff'd,* 114 F.3d 851 (9th Cir. 1997) ("An expert's experience is given significant weight in determining the witness' qualifications as an expert if only technical knowledge is required. If, however, scientific knowledge is necessary the expertise must be coextensive with the particular scientific discipline.").

Mr. Uhl avers that when determining the crashworthiness of a ROPS and restraint harness systems, he "[has] always followed the exact principles discussed by G.C. Rains in his published paper." (Doc. 182-5 at 14). However, Mr. Rains's "published paper,"[4] details "[a] test program [that] was conducted to determine the effectiveness of a seat belt restraint in preventing occupant movement in a [tractor] rollover accident." Glen C. Rains, *Initial Rollover Effectiveness Evaluation of an Alternative Seat Belt Design for Agricultural Tractors*, J. Agric. Safety and Health, March 2000, 13-27. Mr. Rains provides

---

[4] The Court notes that while Plaintiffs provide that they attached Mr. Raines's "published paper" as an exhibit to Mr. Uhl's affidavit (Doc. 182-5); they are mistaken. Thus, the Court was forced to find and access Mr. Raines's "published paper" on its own.

- 8 -

specific details on his methodology for the rollover restraint test, the test instrumentation used, and the data collected. *Id.* In other words, Mr. Rains's "published paper" is a highly technical summary of a test he conducted to determine the effectiveness of different types of restraint systems in preventing occupant movement in tractor rollover accidents. *Id.* Mr. Rains provided that:

> [i]n collisions and rollovers, the forces exerted on the tractor are transferred to the operator, minus the energy absorption of the tractor and impacted surface (ground), and will cause the tractor operator to move in the direction of the impact force. The operator's inertia will then pull against the seat belt and cause the operator to move off the seat. The amount of movement is dependent on the properties of seat belt restraint, the size of the operator, and the force and direction of the impact.

*Id.* at 14. Essentially, Mr. Rains details the type of mathematical calculation that would need to be conducted in order to determine the amount of movement an occupant would experience with a specific ROPS and restraint harness systems in a rollover accident.

There is no evidence that Mr. Uhl has the qualifications to perform such a calculation, nor is there evidence that he actually performed any such calculation here. *See Diviero,* 919 F. Supp. at 1357 ("Expertise in the technology of fruit is not sufficient when analyzing the science of apples."); *see also Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Furthermore, although Mr. Uhl avers that as part of his work as a trainer and consultant, he "examine[s] the geometric characteristics" of off-road vehicles to determine whether the ROPS and restraint harness systems would adequately protect a passenger in a rollover accident—aside from stating that he follows the methodology described in Mr. Rains's published paper—Mr. Uhl fails to explain the steps he uses to make that determination. (Doc. 182 at 9-12). The Court struggles to understand how Mr. Uhl could have "followed the exact principles discussed by G.C. Rains in his published paper" when he did not conduct any testing or perform any calculations. Thus, Mr. Uhl's opinions regarding the

adequacy of the Polaris RZR's restraint harness system and ROPS was based on nothing more than subjective belief and unsupported speculation. *See Menz v. New Holland N. Am., Inc.,* 460 F. Supp. 2d 1058, 1065 (E.D. Mo. 2006), *aff'd*, 507 F.3d 1107 (8th Cir. 2007) (holding that the expert's "testimony regarding the absence of a ROPS lack[ed] a reliable basis in engineering, science or otherwise, and thus [was] too speculative to be admissible."); *Black v. M & W Gear Co.*, 269 F.3d 1220, 1237–38 (10th Cir. 2001) (holding that the district court's decision to exclude expert testimony that a ROPS would not have saved plaintiff's life was not an abuse of discretion because the expert did not conduct any tests or calculations to support his opinion).

Mr. Uhl's reasoning and methodology in arriving at his conclusions regarding the Polaris RZR's ROPS and restraint harness systems is inadequate and not based on a reliable foundation. Accordingly, Mr. Uhl cannot opine on whether the Polaris RZR's restraint harness system and ROPS provided adequate protection in a rollover accident.

### 3. Mr. Uhl Can Opine on the Handling Characteristics of the Polaris RZR.

Mr. Uhl opined that "Polaris failed to eliminate the tendency for the RZR to tip / roll over even during routine maneuvers going down a slope or on flat ground, simply by turning the steering wheel too far too fast." (Doc. 182-4 at 13). In his deposition, Mr. Uhl elaborated on this opinion, stating that the Polaris RZR was more susceptible to over steering than other utility vehicles. (Doc. 109 at 195). In his expert report, Mr. Uhl lists a number of governmental agencies and private companies he has consulted with regarding selecting appropriately designed off-road vehicles for their operational needs and provided training for those off-road vehicles.[5] Thus, the Court finds that Mr. Uhl has extensive

---

[5] In their Reply, Plaintiffs submitted an Affidavit from Mr. Uhl, in which Mr. Uhl elaborates on his qualifications. (Doc. 182-5 at 2-16). Defendants request that this Court either strike Mr. Uhl's Affidavit or allow Defendants to further depose Mr. Uhl, arguing that Mr. Uhl's Affidavit was an untimely supplementation to his expert report. (Doc. 184 at 4). At this late stage, neither party is permitted to submit supplemental expert reports that "state[ ] additional opinions or rationales or seek[ ] to 'strengthen' or 'deepen' opinions expressed in the original expert report exceed[] the bounds of permissible supplementation and [are] subject to exclusion under Rule 37(c)." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006); *see also Zeolla v. Ford Motor Co.*, 2013 WL 308968, at *10 (D. Mass. Jan. 24, 2013) ("However, the bar on late supplemental expert reports does not preclude either party from submitting additional affidavits intended to establish the reliability of already proferred [sic] opinions in response to a motion to exclude.").

experience operating off-road vehicles and, based on that experience, is knowledgeable concerning the differences between the Polaris RZR and other off-road vehicles; therefore, the Court finds that Mr. Uhl is qualified to opine on the handling characteristics of the Polaris RZR.

However, while Mr. Uhl does have sufficient knowledge concerning the steering mechanisms of off-road vehicles in general, the Court will not permit Mr. Uhl to testify that Polaris failed to eliminate the Polaris RZR's tendency to over steer. That opinion goes to the availability of an alternate Polaris RZR steering design and Mr. Uhl does not provide any data or evidence on the availability of an alternate steering design. Moreover, Mr. Uhl did not conduct any tests to evaluate alternate steering designs. Thus, the Court finds that Mr. Uhl lacked any specific basis on which to opine on the availability of an alternative steering design.

### C. Plaintiffs' *Daubert* Motion (Doc. 179)

Here, Plaintiffs have challenged the expert qualifications of Defendants' expert Elizabeth H. Raphael, MD, FACEP. (Doc. 179 at 4). Dr. Raphael is a practicing emergency room physician and mechanical engineer. (Doc. 179-2 at 2). She earned her Bachelor of Science degree in Mechanical Engineering from the Massachusetts Institute of Technology and her Doctor of Medicine degree from Wayne State School of Medicine. (Doc. 180-1 at 1). Dr. Raphael has served as a research engineer at Henry Ford Hospital Department of Neurosurgery, a researcher at Massachusetts General Hospital Department of Orthopedic Surgery, and a Clinical Associate Professor in the Department of Emergency Medicine at Stanford University School of Medicine. (*Id.*) Dr. Raphael has also published papers and given lectures regarding the biomechanics of injuries sustained in collisions. (*Id.* at 2-4).

---

However, after reviewing the affidavit in conjunction with Mr. Uhl's deposition testimony and expert report, the Court concludes that the affidavit is a permissible explanation of Mr. Uhl's qualifications and experience. Thus, the Court will not strike Mr. Uhl's Affidavit, nor will the Court permit the Defendants to further depose Mr. Uhl. *See Zeolla*, 2013 WL 308968, at *11 (holding "if the affidavit is simply intended to provide additional insight into [the expert's] method of analysis, then it is entirely appropriate for the Court to consider the affidavit.").

Plaintiffs argue that Dr. Raphael should be precluded from testifying because she is not qualified, her opinions are unreliable, and her opinions constitute inadmissible hearsay. (Doc. 179 at 10). Plaintiffs further argue that Dr. Raphael's opinions should be excluded under Rule 403 because the probative value is "outweighed by the danger of under [sic] prejudice, misleading and confusing the jury and the issues, and the needless consumption of time"; and that her report contains inadmissible hearsay under Rule 802. (*Id.* at 10-11).

### 1. **Sufficiency of Dr. Raphael's Qualifications**

Here, Plaintiffs argue that Dr. Raphael is only an "emergency room physician[,] . . . not a neurosurgeon[,]" and therefore she "is not qualified to testify as expert witnesses on neurosurgical issues." (Doc. 179 at 9). In other words, Plaintiffs are arguing that Dr. Raphael's medical experience and background is not applicable to the particular scientific opinions she offers in this case. Dr. Raphael has opined on the biomechanical processes that caused Mr. Thompson's spinal injury during the subject crash. For more than twenty years, Dr. Raphael has been an expert in the field of biomechanics and, as a Principal Engineer at Delta V Biomechanics, she analyzes the biomechanical forces and effects related to collisions and other mechanism of injury. (Doc. 180-2 at 1-2). Additionally, Dr. Raphael is a practicing emergency room physician. (*Id.*)

Dr. Raphael opines on how Mr. Thompson's body, including his head and neck, would have moved during the rollover crash. (Doc. 180-4 at 7-14). Dr. Raphael's background and expertise makes her qualified to opine on such topics. *Contreras v. Brown*, 2018 WL 7254917, at *3 (D. Ariz. Dec. 4, 2018) (finding that "expected motions and forces that would have been experienced" during the car accident were within the expert's biomechanical engineer expertise). Dr. Raphael also opines on the mechanism of Mr. Thompson's injuries. (Doc. 180-4 at 15-17). Plaintiff argues that Dr. Raphael in not qualified to opine on the mechanism of injury because she is not a neurosurgeon. (Doc. 179 at 9). The Court disagrees. Plaintiffs do not provide any authority to support the proposition that only a neurosurgeon can opine on the mechanism of injury when the injury is to the plaintiff's spine. The Court finds that, as an emergency room physician, Dr.

Raphael is qualified to opine on the mechanism of injury. *Contra Contreras*, 2018 WL 7254917, at *3 (finding that the biomechanical engineer expert did not have the necessary medical training to testify to the medical causation of the plaintiffs' specific injuries); *Oaks v. Westfield Ins. Co.*, 2014 WL 198161, at *2 (E.D. La. Jan. 16, 2014) (finding that the biomechanical expert was not qualified to testify that the force of the impact could not have caused the plaintiff's injuries "because he [was] not board certified or qualified in any medical specialty, he has not practiced clinical medicine in over a decade, and he has never been licensed to practice medicine in the United States.").

Accordingly, the Court finds Dr. Raphael to be qualified to testify to the mechanical aspects of the forces of the accident and the medical causation of Mr. Thompson's specific injuries.

### 2. **Reliability of Dr. Raphael's Opinions**

Reliability analysis focuses on the "principles and methodology" of the expert, "not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. However, "conclusions and methodology are not entirely distinct from one another" and nothing "requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co.,* 522 U.S. at 146. Concerns regarding the admission of "shaky" evidence are resolved through the trial process through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596; *see also Tavilla v. Cephalon Inc.*, 2012 WL 1190828, at *4 (D. Ariz. Apr. 10, 2012) ("vigorous cross-examination is still the preferred method for determining the truth of questionable opinion evidence."). The district court is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc.,* 738 F.3d 960, 969 (9th Cir. 2013). Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969–70.

Here, Plaintiffs argue that Dr. Raphael's opinions are based upon flawed

methodology, and are therefore speculative and unreliable. Specifically, Plaintiffs contend that Dr. Raphael's opinions are based on the Incident Specific Orientation Inversion Test ("Spit Test"), and the Spit Test is not reliable because it was conducted in a manner that is contrary to accepted methodologies. (Doc. 179 at 3-5).

A spit test is "is a demonstration where engineers place a surrogate inside an exemplar vehicle, secure the vehicle to an inversion apparatus, and invert the surrogate and vehicle to a predetermined angle. The purpose of this testing is to understand the interaction of the surrogate with the restraint system and vehicle structures in a 1G environment." (Doc. 180-2 at 2). The Spit Test at issue was designed by Dr. Raphael, but performed by Exponent, Inc. Plaintiff contends that this Spit Test is unreliable because Dr. Raphael was not physically present when the test was conducted, the test was not videotaped, the height of the surrogate used in test was an insufficient match for Mr. Thompson, and the engineers conducting the demonstration did not follow Dr. Raphael's instructions. The Court disagrees, and finds that the Plaintiffs' challenges to Dr. Raphael's methodology go to the weight of the testimony and its credibility, not its admissibility. *See Alaska Rent-A-Car*, 738 F.3d at 970 ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."); *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.").

While, the Spit Test was not videotaped, Plaintiffs have not put forth evidence that supports their argument that the absence of videotaping makes the entire test unreliable. Moreover, it appears that Dr. Raphael watched the entire test via videoconference and therefore her absence goes to credibility, not admissibility. Additionally, although the surrogate used in the Spit Test was two inches taller than Mr. Thompson, the Court notes that Plaintiffs' expert Dr. Brian Benda used a surrogate in his testing who was an inch and five-eighths taller than Mr. Thompson. (Doc. 115 at 104). Moreover, Dr. Raphael states that the Spit Test was conducted to her specifications. Thus, the Court cannot conclude

that the Spit Test is so deficient that it–and any opinions that rely on it—should be excluded. Plaintiffs remain free to explore any differences or deficiencies in the Spit Test on cross examination and by presenting their own expert's testing.

### 3. **Applicability of Rules 403 and 802**

First, Plaintiffs argue that the probative value of Dr. Raphael's opinions are outweighed by the danger of undue prejudice, misleading and confusing to the jury and the issues, and the needless consumption of time. The Court disagrees. *See Thompson v. TRW Auto., Inc.*, 2014 WL 12781291, at *5 (D. Nev. June 2, 2014) ("Although presentation of this evidence may take time, the Court is not persuaded that this evidence will result in an undue delay or waste of time."). Moreover, the Court finds that Plaintiffs failed to articulate how the inclusion of Dr. Raphael's opinions would be prejudicial, misleading, or confusing.

Plaintiffs further argue that Dr. Raphael was not present for the Spit Test; therefore, her opinions are based on inadmissible hearsay. (Doc. 179 at 11). The Court disagrees. *See United States v. 0.59 Acres of Land*, 109 F.3d 1493, 1496 (9th Cir. 1997) ("Of course, an expert may base his opinion at trial on inadmissible facts and data of a type reasonably relied upon by experts in his field."). However, if inadmissible evidence used by Dr. Raphael is offered by Defendants to illustrate and explain her opinion at trial, Plaintiffs can, at that time, raise their objections. *See id.* (finding that if inadmissible evidence is admitted to explain an expert's opinions, it is necessary for the Court to provide a limiting instruction to the jury).

Accordingly,

**IT IS ORDERED** that Plaintiffs' Unopposed Motion to Seal Plaintiffs' Response to Defendants' *Daubert* Motion (Doc. 181) is **DENIED.** Within seven (7) days from the date of this Order, Plaintiffs are directed to publicly file Plaintiffs' Response in Opposition to Defendants' Motion to Exclude Expert Testimony of Bill Uhl and Exhibits Attached Thereto currently lodged at Doc. 182.

**IT IS FURTHER ORDERED** that Defendants' *Daubert* Motion to Exclude the

Expert Testimony of Bill Uhl (Doc. 176) is **GRANTED in part** and **DENIED in part** as follows:

1) Mr. Uhl is precluded from testifying as to the adequacy of the design process of the Polaris RZR and the adequacy of the Polaris RZR's ROPS and restraint harness system; and

2) Mr. Uhl can testify as to the steering characteristics of the Polaris RZR, but cannot testify regarding Polaris's alleged failure to eliminate the Polaris RZR's tendency to over steer.

**IT IS FINALLY ORDERED** that Plaintiffs' Corrected *Daubert* Motion to Exclude the Expert Testimony of Elizabeth Raphael (Doc. 179) is **DENIED**.

Dated this 14th day of May, 2019.

Honorable Diane J. Humetewa
United States District Judge